J-A16030-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.N.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M.B., MOTHER | : | |
| | : | |
| | : | No. 54 WDA 2026 |

Appeal from the Order Entered December 9, 2025
In the Court of Common Pleas of Greene County Orphans' Court at
No(s):  2025 OA 034

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.E.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M.B., MOTHER | : | |
| | : | |
| | : | No. 55 WDA 2026 |

Appeal from the Order Entered December 9, 2025
In the Court of Common Pleas of Greene County Orphans' Court at
No(s):  2025 OA 035

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M.B., MOTHER | : | |
| | : | |
| | : | No. 56 WDA 2026 |

Appeal from the Order Entered December 9, 2025
In the Court of Common Pleas of Greene County Orphans' Court at
No(s):  2025 OA 036

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.-M.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A16030-26

|                              |   |                   |
|------------------------------|---|-------------------|
|                              | : |                   |
|                              | : |                   |
|                              | : |                   |
| APPEAL OF: A.M.B., MOTHER    | : |                   |
|                              | : |                   |
|                              | : |                   |
|                              | : |                   |
|                              | : | No. 57 WDA 2026   |

Appeal from the Order Entered December 9, 2025
In the Court of Common Pleas of Greene County Orphans' Court at
No(s):  2025 OA 037

BEFORE:  McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: August 11, 2026**

Appellant, A.M.B. ("Mother"), appeals from the orders entered in the Greene County Court of Common Pleas, Orphans' Court, which granted the petitions of Appellee, Green County Children and Youth Services ("CYS"), to involuntarily terminate Mother's parental rights to her minor children, A.-M.M.T., M.L.T., J.E.T., and J.N.T. (collectively "Children").  We affirm and grant counsel's petition to withdraw.

The relevant facts and procedural history of this case are as follows.  On October 1, 2025, CYS filed petitions for involuntary termination of Mother's parental rights to A.-M.M.T., born July of 2014, M.L.T., born March of 2016, J.E.T., born September of 2018, and J.N.T., born March of 2020.  In the petitions, CYS summarized its history of involvement with Mother and Children as follows:

> [CYS] filed a petition to adjudicate [Children] dependent on June 25, 2024.  An adjudication hearing was scheduled to occur on July 25, 2024, but was continued to August 15, 2024, which was subsequently continued to October 24, 2024, to allow the parents time to participate in …

recommended services[.] … On August 21, 2024, the court granted a motion presented by [Mother] requesting the October 24, 2024 hearing to be continued and the adjudication hearing was continued to November 7, 2024.

Due to [Mother's] refusal to submit to a drug screen and non-compliance with services, on September 4, 2024, [Children] were entered into a 60-day Safety Plan with [Children's father, J.R.T. ("Father")] and [Children's] babysitter, Loretta Efaw, stipulating that [Mother] would not be allowed to be around [Children] and not to be in the home at all until she begins services and test[s] negative for all illegal substances.

On September 20, 2024, [CYS] received a report indicating [that Mother] struck [Father] with a truck causing [Father] to obtain severe brain damage. At the time of filing, [Father] was in Allegheny General Hospital on a ventilator, with a poor prognosis of survival. The report further indicated that [Mother] presented to the home of [Father] on the morning of September 20, 2024 and attempted to take [J.N.T.]; however [Father] refused to allow [Mother] to take [J.N.T.] in accordance with the Safety Plan. It is alleged that [Mother] began to physically assault [Father]. The babysitter and responsible party in the Safety Plan, Loretta Efaw, took [J.N.T.] away from the home and transported him to school.[1]

\* \* \*

On September 20, 2024, at 4:01 p.m. [the Orphans' Court] granted [CYS] emergency protective custody of [Children] … due to parental substance abuse, domestic violence

---

[1] Mother disputes the allegations in the September 20, 2024 report received by CYS. At the time of the termination hearing, Mother had pending criminal charges against her as a result of this incident. Since the criminal charges were unresolved, all parties agreed not to present evidence or question witnesses regarding this incident for the court's consideration in deciding on the termination petitions. Nevertheless, we include the details of this alleged report because it provides necessary context to understand the history of this case and the testimony presented at the termination hearing about Mother's relationship with Children.

between the parents, [Mother's] refusal to participate in services, submit drug screens and cooperate with [CYS] and parental inability to provide safe and appropriate care and supervision.

*     *     *

On September 23, 2024, [Father died]….

*     *     *

On November 7, 2024, [Children] were adjudicated dependent and [placed under the care of Ms. Efaw. Mother] was ordered to[:] 1) complete a drug and alcohol evaluation and follow through with the recommendations, 2) complete a psychiatric evaluation and follow through with the recommendations, 3) complete SAFE Parenting, 4) complete anger management counseling, 5) participate in family reunification services, 6) obtain and maintain safe and appropriate housing, 7) sign all release of information forms requested by [CYS], and 6) submit to random drug and alcohol testing at [CYS's] request, performed by [CYS].

(Petition for Involuntary Termination of Parental Rights, filed 10/1/25, at 3-4) (unpaginated).

On October 17, 2025, the Orphans' Court scheduled a hearing on the termination petitions for December 3, 2025. On November 6, 2025, Mother's prior counsel filed a motion to withdraw, stating that his attorney-client relationship with Mother had broken down. On November 12, 2025, the court granted prior counsel's motion to withdraw and appointed Attorney John Headley to represent Mother. On November 20, 2025, Mother filed a motion to continue the termination hearing. As the basis for this request, Mother noted that her counsel was newly appointed and needed additional time to review Mother's files to prepare for the hearing. Mother further noted that

criminal charges were pending against her related to the September 20, 2024 incident with Father and Mother would be limited in her ability to testify regarding this matter due to her constitutional privilege against self-incrimination. The court denied the motion for continuance on November 26, 2025.

The Orphans' Court held a termination hearing on December 3, 2025. At the beginning of the hearing, Mother renewed her request for a continuance, specifically seeking additional time to conduct a second bonding assessment between Mother and Children. The court denied the request. Further, all parties agreed that they would not present evidence or ask questions regarding the September 20, 2024 incident.

Mother testified that prior to Children's adjudication, she lived in the same residence as Children and Father. When asked if she was living with them full-time, Mother stated that she was there "when she was allowed to be." (N.T. Termination Hearing, 12/3/25, at 67). When asked for further clarification on what she meant by full-time, Mother stated, "when I was allowed to be a mother, I was a mother." (*Id.*) Mother further stated that during that time she had a good relationship with Children. She performed parental tasks such as getting Children up for school, bathing them, and getting them ready for bed. Mother testified that Father was violent towards her, which occurred in front of Children, and would tell her to leave the house. Mother stated that even though she was not there every night, she "tried to do the best that [she] could with what [she] was dealt." (*Id.* at 85). Mother

- 5 -

did not seek to gain custody of Children during this time period.

Mother acknowledged that at the time of the hearing, Children had been in CYS custody for more than a year. Mother testified that in that time, she completed some of the services that the court ordered her to complete but conceded that she had not completed all of them. Mother further admitted that she knew she was ordered to complete these services for the purpose of reunifying with Children but expressed confusion as to which services she needed to complete.

Specifically, Mother testified that she completed three drug and alcohol evaluations and did not receive a recommendation for treatment following any of these evaluations. Mother stated that she did not receive any documentation from these organizations regarding her evaluations and as such, did not provide documentation of these evaluations to CYS. Mother conceded that she did not follow up with these organizations after her evaluations to inquire whether a report containing recommendations had been generated. Mother has not engaged in drug and alcohol treatment since Children have been adjudicated but participates in online support groups. Mother acknowledged that she has a history of substance abuse but stated that she has not used illicit substances since September of 2024. Mother submitted to random drug and alcohol testing and tested negative on every test she took. Mother acknowledged that there have been instances where CYS was unable to perform a random drug test because Mother was not home at the time that they arrived to conduct the testing.

Mother further testified that she completed a mental health evaluation. Mother stated that she did not give CYS a copy of the recommendations from the evaluation because she did not receive it. Mother further completed an anger management course. Mother also completed the in-class portion of the SAFE Parenting program but did not complete the in-home portion of the program. Mother stated that she attempted to complete the in-home portion on two occasions. On one occasion, the program worker did not show up and on the other occasion, Mother failed to confirm on the morning of the appointment because she was unaware that she had to.

Mother currently lives in the residence of her friend, Lewis Jay Johnson. This residence has two spare bedrooms, in which Mother has bunk beds to accommodate Children. Mother testified that Mr. Johnson agreed to permit Mother and Children to live in the residence. Mother presented a lease agreement, dated September 1, 2025, which states that Mother and Children may stay at the residence until 2030 for a monthly rent of $1.00. Mother previously allowed CYS to inspect the residence. Mother acknowledged that CYS has not inspected the house since August 2025. Mother testified that she was not preventing CYS from doing so but merely was not home whenever CYS came to inspect the home. Mother stated that she was aware that CYS attempted to visit her house in September, October and November because she saw the cards they left on her door stating that they attempted to visit. Mother admitted that after she received these cards, she did not call the number on the cards to ask CYS to return.

Mother acknowledged that she does not work outside the home and has not had full time employment since 2016. When asked how she would financially support Children if they were returned to her care, Mother stated that she gets paid for doing tasks for a friend, Debra Blouir, who broke her foot and needs assistance. Mother further stated, "I'll figure it out. I mean, I guess I don't have a set plan for that — the financial part. But it'll come." (*Id.* at 104).

Regarding visits with Children, Mother testified that she has supervised visits with Children for two hours a week. Mother has been approved to have community visits with Children, and she typically visits with Children at restaurants, parks, or the library. Mother acknowledged that there have been instances where she has ended these visits with Children early. Mother stated that this has occurred for various reasons, including when Children were bored or cold, or because Children wanted to go home after a long day at school. Mother also acknowledged that there have been instances where she has cancelled visits with Children.

Mother testified that A.-M.M.T. behaved normally with Mother during visits. A.-M.M.T. only distanced herself from Mother when there were other adults around. Mother further stated that M.L.T. has more recently begun to follow A.-M.M.T.'s lead and has started to distance herself from Mother. Mother testified that she attempted to perform parental duties for Children. She tried to go to Children's appointments when she was informed of them. Mother also reported that she asked for Children's school pictures and report

cards but did not receive them. Mother testified that she was often not told of Children's activities but had attended some, including school enrollment, school concerts and soccer games. Mother also agreed that Ms. Efaw "stepped up … as somebody that could be there for them" and has been doing well taking care of Children's needs. (*Id.* at 69). Mother agreed that Children are safe and stable in Ms. Efaw's care.

Rachel Rodriguez, who works for the SAFE Parenting program, testified that Mother completed the in-class portion of the program and received a certificate of completion in January of 2025. Following this, Mother was supposed to start the in-home portion of the program, which is recommended to be completed at a pace of two sessions in the home per month. Ms. Rodriguez testified that she attempted to contact Mother multiple times at various phone numbers to schedule the in-home part of the program, but Mother either did not call back, or Mother's phone was disconnected. Mother did not contact Ms. Rodriguez until May of 2025. Ms. Rodriguez scheduled a class with Mother at Mother's residence for May 9, 2025 and confirmed the time and date with Mother on May 8, 2025. Nevertheless, when Ms. Rodriguez arrived at Mother's residence at the scheduled time, there was no one present at the house. Ms. Rodriguez waited for approximately 10 minutes and left a note on the door with her contact information, the time and the date. Ms. Rodriguez did not receive a call from Mother following this to reschedule. Ms. Rodriguez attempted to contact Mother by phone several times thereafter but did not hear back from Mother.

Joyce McMullen, a caseworker who provides family reunification services, testified that she provided some family reunification services to Mother. Ms. McMullen stated that when she provided services, she scheduled appointments with Mother at Mother's residence. Mother participated in 15 scheduled sessions with Ms. Rodriguez but cancelled or failed to show for six appointments. Ms. Rodriguez testified that Mother made improvement in the beginning stages, but progress stagnated in the later stages. Specifically, Mother did not make progress in her ability to communicate and repair her relationship with Children, particularly with A.-M.M.T. who did not want to interact with Mother during visits. Ms. McMullen testified that due to the missed appointments and Mother's lack of progress, Mother has not completed family reunification services.

Abigail Tylus, a caseworker at CYS, testified that she fully explained the permanency plan to Mother. She recounted one meeting which lasted approximately an hour, during which Mother stated that she was confused about the court ordered services so Ms. Tylus "went over every service step-by-step." (*Id.* at 158). Mother did not contact Ms. Tylus following this meeting to say that she was still confused. Mother completed an anger management course and underwent a mental health evaluation. Mother completed the in-home portion of SAFE Parenting but did not complete the full program. Mother also participated in some family reunification services but not consistently and not to the extent expected. Ms. Tylus testified that meeting with family reunification services twice a month at a minimum is

typically expected but Mother did not participate at all between April and July, in September, or after October.

Ms. Tylus testified that Mother has been living at the same residence since the beginning of this case. Mother had not provided Ms. Tylus with a copy of a lease agreement for the residence and Ms. Tylus had not previously seen the document that Mother presented at the hearing. Ms. Tylus inspected the residence and confirmed that it appeared to be an appropriate space for Children. Nevertheless, Ms. Tylus noted that CYS made 16 attempts to visit the house and was only able to inspect the residence on five occasions.

Ms. Tylus testified that CYS has concerns about substance abuse with Mother due to Mother's history of substance abuse. To Ms. Tylus' knowledge, Mother has not completed a drug and alcohol evaluation. Ms. Tylus has not received any documentation of the three drug and alcohol evaluations that Mother claimed to have undergone. Ms. Tylus confirmed that Mother submitted to eight random drug tests in the last year and they have all been negative. Nevertheless, Ms. Tylus noted that many of these tests occurred at court hearings. Ms. Tylus reported that CYS has not been able to test Mother randomly at her residence on many occasions because Mother was not present at the house. Following each of these unsuccessful attempts, Ms. Tylus left a card on the door containing contact information, the date, and the time. Mother has never contacted Ms. Tylus to ask her to return.

Ms. Tylus has observed Children in Ms. Efaw's care and noted that they seemed calm, happy and settled in their day-to-day lives. Ms. Tylus does not

believe that Children will suffer any detrimental or negative effects from terminating Mother's parental rights because they are safe and secure in Ms. Efaw's care.

The court accepted Eric Bernstein, a clinical psychologist, as an expert in psychology. During *voir dire*, Dr. Bernstein confirmed that he maintains neutrality when conducting evaluations for the court. When asked whether he had ever recommended against terminating a parent's parental rights to a child, Dr. Bernstein stated that he could not recall a specific instance, but he was sure that he had.

Dr. Bernstein conducted a bonding assessment of Children with Mother as well as Children with Ms. Efaw. During the session with Mother and Children, Mother initially approached Children with energy and enthusiasm, making an earnest attempt to support them and give them attention. A.-M.M.T. rejected Mother's attempts and essentially ignored her. Mother initially made a good effort to communicate and engage with A.-M.M.T. Nevertheless, the situation devolved when the other children also started to become disruptive. Mother and A.-M.M.T. began expressing anger. At one point, A.-M.M.T. became so emotional that Dr. Bernstein asked CYS to intervene and remove A.-M.M.T. from the room for a period of time. When she returned, A.-M.M.T. was less hostile but remained resigned and quiet for the rest of the session.

Dr. Bernstein testified that A.-M.M.T. learned information about Father's death from Ms. Efaw and she blames Mother for Father's death. A.-M.M.T.

also told Dr. Bernstein that even before they were adjudicated dependent, Father was their primary caregiver and Mother's parenting time was limited by Mother's own struggles. Further, A.-M.M.T. complained of physical mistreatment with a spatula, cursing, and absent parenting from Mother.

Dr. Bernstein observed that Mother was able to manage Children in the beginning when they were having snacks and being playful. However, Mother had difficulty managing Children's emotional dysregulation and became emotionally dysregulated herself in response. Dr. Bernstein did not observe any indications of neglect or physical mistreatment during the session.

Regarding Ms. Efaw, Dr. Bernstein observed that Ms. Efaw was able to attend to all four of the children's needs. Ms. Efaw maintained composure and demonstrated patience in their interactions. Additionally, Children appeared to be comfortable in Ms. Efaw's presence, seeking her attention and coming to her for their needs. Children seemed attached to and well bonded with Ms. Efaw. Dr. Bernstein approves of Ms. Efaw as an adoptive resource for Children because Ms. Efaw appears to be a stable adult with a strong relationship with Children who is providing for all their needs.

Dr. Bernstein opined that there is a bond between Mother and Children, but that bond has been "unduly compromised by a myriad of factors, including but not limited to, … the removal, restricted level of contact, [Mother's] own respective challenges in life, [Children's] established and building relationship with Ms. Efaw," and Children's exposure to information about their father's death. (*Id.* at 24). Dr. Bernstein concluded that although terminating

Mother's parental rights would have some negative impact on Children, those effects "could be mitigated … by their preserved stability, strengthening relationship with Ms. Efaw, … mental health intervention, and time, too." (**Id.**)

Ms. Efaw testified that Children have been in her care since September 2024. Prior to this, Ms. Efaw worked with Father and would often babysit Children when Father needed to work. Since Children have been in her care, Ms. Efaw has been meeting all their daily needs. Children are doing very well in school. Ms. Efaw stated that Children are happy and thriving in her care, knowing that they have a consistent and reliable caretaker every day. She is willing to adopt all four of the children and continue to provide a stable home for them. She is also open to allowing post-adoption contact between Children and Mother.

Ms. Efaw testified that she has difficulty getting the older children to go to visits with Mother. Specifically, A.-M.M.T. cries, stating that she hates the visits and does not want to go. M.L.T. also asks why she has to go. There have been some instances where Ms. Efaw had to pick up Children early because Mother decided to end the visit earlier than scheduled. Ms. Efaw stated that she only tells Children that Father had a really bad accident when they inquire about his death. Ms. Efaw denied that she ever indicated to Children that Mother was to blame for Father's death. Ms. Efaw testified that A.-M.M.T. discovered additional details about Father's accident because it was in the paper, on social media and discussed by her friends.

The parties stipulated that if called to testify, Debra Blouir would

corroborate Mother's testimony regarding Mother's sobriety over the past year. Additionally, Ms. Blouir would testify that Mother has been working for Ms. Blouir. The parties further stipulated that Lewis Jay Johnson would corroborate Mother's testimony regarding her sobriety and confirm the validity of the lease agreement between himself and Mother. The court accepted the stipulation.

Children's counsel informed the court that A.-M.M.T. is very articulate and understands the nature and consequence of the termination proceeding. A.-M.M.T. indicated that she wants Mother's rights to be terminated because she cannot trust or depend upon Mother. She further indicated that she wants to be adopted because she and her siblings are in a stable, safe home where they are treated well and all their needs are met. M.L.T. also expressed a hope to be adopted. Children's counsel indicated that J.E.T and J.N.T. were unable to fully comprehend the proceedings due to their age and did not have much to say. However, they both indicated that they wanted to continue to live with Ms. Efaw. Additionally, the guardian *ad litem* ("GAL") recommended to the court that termination of Mother's parental rights would be in Children's best interests.

On December 9, 2025, the Orphans' Court entered orders terminating Mother's parental rights to all four children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). On January 6, 2026, Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal for each child. This Court consolidated the appeals

*sua sponte* on January 28, 2026.

Preliminarily, appellate counsel seeks to withdraw representation pursuant to **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). **Anders** and **Santiago** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise her of her right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. **See Santiago, supra** at 173-79, 978 A.2d at 358-61. "Substantial compliance with these requirements is sufficient." **Commonwealth v. Reid**, 117 A.3d 777, 781 (Pa.Super. 2015). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. **Commonwealth v. Palm**, 903 A.2d 1244, 1246 (Pa.Super. 2006). **See also Commonwealth v. Dempster**, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In **Santiago, supra** our Supreme Court addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw representation:

> Neither **Anders** nor [**Commonwealth v. McClendon**, 495 Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief provide an argument of any sort, let alone the type of

argument that counsel develops in a merits brief. To repeat, what the brief must provide under **Anders** are references to anything in the record that might arguably support the appeal.

\* \* \*

Under **Anders**, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

**Santiago, supra** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

[I]n the **Anders** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Id.** at 178-179, 978 A.2d at 361. **See also In re J.D.H.**, 171 A.3d 903, 905-06 (Pa.Super. 2017) and **In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992) (explaining that **Anders** procedure applies in appeals from termination of parental rights and goal change orders).

Instantly, appellate counsel has filed an application to withdraw. The application states that counsel has reviewed the record and determined that there are no non-frivolous grounds for an appeal. Counsel subsequently sent a copy of the **Anders** brief to Mother. Counsel also provided Mother with a letter explaining her right to retain new counsel or proceed *pro se* to raise any

additional points Mother deems worthy of this Court's attention.[2]   In the

**Anders** brief, counsel summarized the facts and procedural history of

Mother's case.  The argument section of the brief cites to portions of the record

that might arguably support Mother's issues on appeal.  Counsel also provides

the reasons for counsel's conclusion that the appeal is wholly frivolous.

Therefore, counsel has substantially complied with the technical requirements

of **Anders** and **Santiago**.  **See Reid, supra**.

Mother has not responded to the **Anders** brief *pro se* or with newly

retained private counsel.  Counsel raises the following issues on Mother's

behalf:

> Whether there is any nonfrivolous issue presented on appeal with respect to the trial court's orders of December 9, 2025 terminating the parental rights of [Mother] to the minor children, J.N.T., J.E.T., M.L.T., and A.-M.M.T., as it relates to whether the said orders are based on clear and convincing evidence supporting the applicable statutory grounds under which [CYS] filed its petitions seeking such terminations and properly reversible under the applicable standard of review…?
>
> Whether there is any nonfrivolous issue presented on appeal by the manner in which the trial court took stipulations of the content of testimony of [Mother's] witnesses and considered and weighed such stipulations under the applicable standard of review…?

---

[2] In counsel's initial letter to Mother, counsel failed to adequately inform Mother of her immediate right to proceed in the appeal *pro se* or through privately retained counsel.  By order filed on March 10, 2026, this Court directed counsel to file a letter addressed to Mother advising her of her appellate rights and proof of service on Mother.  On March 17, 2026, counsel complied with this Court's directives.

Whether there is any nonfrivolous issue presented on appeal by the trial court's denial of [Mother's] November 20, 2025, motion for continuance as renewed at the time of the December 3, 2025, termination hearing in the instant cases under the applicable standard of review…?

(**Anders** Brief at 7).

In her first two issues combined, Mother argues that she made diligent efforts to address the issues CYS identified in order to reunify with Children. Specifically, Mother asserts that she has not abused substances in a year, as demonstrated by the multiple negative drug tests conducted by CYS. Mother contends that she also presented evidence that she has stable and appropriate housing for herself and Children. Mother claims that the court disregarded the stipulated testimony of her witnesses, who corroborated Mother's testimony regarding her sobriety and housing.

Mother further argues that while she did not complete all court ordered services in her permanency plan, "the requirements of the permanency plan were simply means to the ultimate end of remedying the underlying conditions leading to [Children's] removal." (**Id.** at 26). In that regard, Mother asserts that she took "steps to alleviate [those underlying] conditions in a manner more suitably tailored to her own unique needs[.]" (**Id.**) Mother argues that she attempted to perform parental duties for Children under the restrictions placed on her by CYS. Specifically, Mother claims that she maintained consistent contact with Children, requested pictures, sought information about their education and medical appointments, and attended Children's

extracurricular activities when was informed of them. Mother maintains that she has maintained a relationship with Children, given the circumstances, and her bond with Children is necessary and beneficial for Children's welfare. Mother concludes that the court erred in finding that CYS established by clear and convincing evidence that termination of her parental rights was warranted under Section 2511(a)(2) and (b), and this Court should vacate the termination orders.[3]  We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

[*In re B.L.W., supra* at 383] (internal citations omitted).

_____

[3] Mother also argues that the Orphans' Court erred in finding that termination was appropriate under Sections 2511(a)(1), (5), and (8).  Nevertheless, "we need only agree with [the Orphans' Court's] decision as to any one subsection [of Section 2511(a), in conjunction with subsection (b),] in order to affirm the termination of parental rights."  *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The Orphans' Court granted involuntary termination of Mother's parental rights to Children on the following grounds:[4]

### § 2511. Grounds for involuntary termination

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[4] Although the Orphans' Court also terminated Mother's parental rights under subsections (a)(1), (5), and (8) as previously stated, we need only analyze one subsection under 2511(a) in conjunction with subsection (b).

- 21 -

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  *In re Z.P., supra* at 1117.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of [her]… parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether

- 23 -

termination would destroy an existing, necessary and beneficial relationship.

When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

- 24 -

Instantly, the Orphans' Court did not find Mother's testimony at the termination hearing to be credible. Specifically, the court noted that although Mother claimed she was not abusing any substances and produced several negative drug tests, Mother's failure to make herself available for numerous random drug tests called into question the veracity of her testimony, particularly given her admitted history of serious substance abuse. The court did not find Mother's explanation for why she was unavailable on so many occasions believable, particularly because Mother acknowledged that she does not work outside the home and Mother failed to make any effort to contact CYS staff when she learned that they had attempted to visit. Additionally, although Mother claimed to have undergone drug and alcohol evaluations, Mother stated the evaluations yielded no recommendations and she failed to submit any documentation of the evaluations to CYS.

Similarly, the court did not find that Mother's housing situation was as stable as Mother represented. The court noted that Mother did not present a lease agreement for the residence until the termination hearing and the lease agreement listed a rental fee of $1.00. Further, Mother acknowledged that she did not have a steady source of income and had no plan on how to financially support Children. While Ms. Tylus testified that the residence appeared safe and appropriate for Children when she inspected it, Ms. Tylus also noted that she had made 11 unsuccessful attempts to inspect the residence. Again, the court did not find credible Mother's explanation for her

lack of availability, finding that Mother "was likely home and was simply not answering the door during the attempts to contact her." (Orphans' Court Opinion, filed 1/27/26, at 4).

Regarding the stipulated testimony of Mother's witnesses on these topics, the court did not specifically address whether it found the stipulated testimony to be credible. Nevertheless, the court did not find Mother's testimony credible, and the stipulated testimony was offered to corroborate Mother's testimony. As such, the record adequately demonstrates that the court also did not find the stipulated testimony credible. Contrary to Mother's assertion, there is no indication in the record that the court disregarded the stipulated testimony of Mother's witnesses. The court accepted the stipulation and assured Mother's counsel that it would consider the stipulated testimony as presented. However, as the fact finder, the court was free to weigh the stipulated testimony against the other evidence and assign weight and credibility to it. *See In re Z.P., supra*. We decline Mother's invitation to reweigh the court's credibility determinations and assign more weight to her witnesses' testimony merely because it was stipulated.

Mother testified that she attempted to provide parental care to Children to the best of her ability under the circumstances. Nevertheless, in the 14 months that Children were in custody of CYS, Mother only had visits with Children for two hours a week. Mother also acknowledged that she sometimes ended these visits early. During this time, Ms. Efaw performed the vast

majority of parental duties for Children.

Further, Mother did not take initiative to complete court ordered services so that Children could be returned to her care. The court found that "[a]lthough Mother … completed some services and stated her desire to be a mother to her [children], she has done very little to successfully follow through to be a parent to [Children], done little to be a bigger part of [Children's lives], and this is due to her own choices." (Orphans' Court Opinion at 8). The court noted that Mother knew that the court ordered services were for the purpose of reunifying with Children. Nevertheless, Mother did not complete many of the services and had periods where she did not participate in services at all. The court did not find credible Mother's statement that she was unaware of what was expected of her, particularly in light of Ms. Tylus' testimony that she explained the permanency plan in detail to Mother. Mother did not offer any explanation for why she did not complete the SAFE Parenting program and family reunification services, which were especially important given the tumultuous nature of Mother's relationship with A.-M.M.T. and to a lesser extent, the other children.

As such, the court concluded that Mother failed to take adequate steps to demonstrate that she was in a position where Children could be returned to her care. As a result of Mother's inaction, Children were left without essential parental care from Mother for a period of 14 months. Further, based on Mother's limited and sporadic cooperation with CYS, the court concluded

that Mother would not or could not remedy the conditions that left Children without parental care in a timely manner. On this record, we discern no error with the court's determination that termination of Mother's parental rights to Children was warranted under Section 2511(a)(2). **See In re Z.P., supra**; **In re A.L.D., supra**; **In Interest of Lilley, supra**. Thus, we need not address the remaining Section 2511(a) subsections. **See In re B.L.W., supra**; **In re Z.P., supra**.

Regarding Section 2511(b), the court acknowledged that Mother loves Children but noted that Mother's relationship with Children, especially, A.-M.M.T., has broken down. The court credited Ms. Efaw and Dr. Bernstein's testimony that A.-M.M.T. is either hostile towards Mother or ignores her during visits. Further, Dr. Bernstein testified that the other children follow A.-M.M.T.'s lead and Mother was unable to manage Children's emotional dysregulation. The court further noted that Mother failed to take any accountability for the breakdown in her relationship with Children.

Further, Children are doing well in Ms. Efaw's care, and all their needs are being met. Dr. Bernstein testified that Children are comfortable in Ms. Efaw's presence and appear to be well bonded with her. Dr. Bernstein further opined that any negative effects of terminating Children's bond with Mother could be mitigated by the stability and permanency in Ms. Efaw's care. The court also found that due to Children suffering the trauma of simultaneously losing their father and being removed from Mother's care, Children needed

- 28 -

stability and permanency in their lives. The court determined that such stability and permanence was unlikely to occur with Mother in a reasonable amount of time. Further, Children's counsel reported that A.-M.M.T. and M.L.T. wished to remain in Ms. Efaw's care. The GAL also opined that termination of Mother's parental rights was in Children's best interests. On this record, we discern no error with the court's conclusion that termination of Mother's parental rights was appropriate pursuant to Section 2511(b). *See Interest of K.T., supra*; *In re Z.P., supra*.

In her third issue, Mother argues that her counsel was appointed to represent her less than a month before the termination hearing was scheduled. Mother claims that this short period of time was insufficient for her counsel to properly prepare for the termination hearing. Mother also asserts that she did not have adequate time to seek a bonding assessment conducted by a second expert. Mother concludes that given her valid reasons for seeking a continuance, the court abused its discretion in denying her initial continuance motion filed on November 20, 2025, and her renewed continuance request at the beginning of the termination hearing. We disagree.

In termination cases, the following principles govern continuance requests:

> The matter of granting or denying a continuance is within the discretion of the trial court. Appellate courts will not disturb a trial court's determination absent an abuse of discretion. An abuse of discretion is more than just an error

in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will.

\* \* \*

Once a court is satisfied that a parent has received notice of the hearing, it is then entirely within the trial court's discretion to make a ruling on the continuance request based on the evidence before it. As in all matters involving parental rights, the best interests of the child are paramount. Accordingly, the exercise of the trial court's discretion includes balancing the evidence submitted in support of the request against other relevant factors, such as a parent's response and participation, or lack thereof, in prior proceedings and appointments important to the welfare of the child. Most importantly, the trial court is in the best position to factor in the impact that further delay will have on the child's well-being.

*In Interest of D.F.*, 165 A.3d 960, 964-65 (Pa.Super. 2017), *appeal denied*, 642 Pa. 460, 170 A.3d 991 (2017) (internal citations and quotation marks omitted).

Here, at the time of the scheduled termination hearing, Children had been removed from Mother's care for fourteen months. Given the length of time of this case and the traumatic losses Children suffered, stability and permanency for Children was an extremely important factor for the court to consider in weighing Mother's continuance requests. Mother's counsel was appointed on November 12, 2025. At that time, the termination hearing had already been scheduled for December 3, 2025. As such, counsel was aware as soon as he was appointed that a termination hearing was pending and had three full weeks to prepare for it. Further, Mother's counsel stated in the

- 30 -

***Anders*** brief that although he initially thought he would need more time to prepare, "counsel was in fact able to clear enough time to substantially review the record of prior proceedings, to interview and provide consultation to [Mother] and to identify and subpoena witnesses for [Mother]." (***Anders*** Brief at 35). On this record, we cannot say the court abused its discretion in denying Mother's initial continuance motion filed on November 20, 2025. ***See In Interest of D.F., supra***.

Regarding Mother's request for a continuance for the purpose of conducting a second bonding assessment, Mother did not present this request to the court until the morning of the termination hearing. A bonding assessment conducted by an expert is not required for the court to evaluate a parent's bond with a child. ***See In re Z.P., supra***. Further a bonding assessment had already been conducted in this case by Dr. Bernstein, who testified that he conducted the assessment as a neutral party pursuant to a court order. As such, we cannot say the court abused its discretion in denying Mother's day-of request to continue the termination proceeding to seek a second bonding assessment, particularly given the length and context of this case. ***See In Interest of D.F., supra***. Following an independent review of the record, we agree that the appeal is frivolous. ***See Dempster, supra***; ***Palm, supra***. Accordingly, we affirm and grant counsel's petition to withdraw.

Orders affirmed. Petition to withdraw is granted.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

8/11/2026